# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

LAURIE ANN CLARK,

                              Plaintiff,

       v.                                   6:12-CV-1507
                                             (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

LOUISE M. TARANTINO, ESQ., for Plaintiff
PETER W. JEWETT, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

       This matter was referred to me for report and recommendation by the Honorable
David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and
Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

       On March 25, 2007, plaintiff applied for both disability insurance benefits and
Supplemental Security Income ("SSI"), alleging disability beginning May 1, 2007.
(Transcript ("T") 137-43).  Plaintiff's applications were denied initially. (T. 64-69).
Plaintiff requested a hearing, which was initially scheduled for July 6, 2010 before
Administrative Law Judge ("ALJ") Marie Greener. (T. 56-61).  On July 6, 2010, ALJ
Greener adjourned the hearing in order for plaintiff to obtain representation. (*Id.*)  The
hearing, at which plaintiff testified, and at which she was represented by counsel, was
ultimately held on February 28, 2011. (T. 34-55).  ALJ Greener issued a decision
denying benefits on April 7, 2011. (T. 18-28).  The ALJ's decision became the final

decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on August 9, 2012. (T. 1-3).

## II. ISSUES IN CONTENTION

The plaintiff makes the following claims:

1. The Commissioner failed to properly determine plaintiff's residual functional capacity ("RFC").[1] (Pl.'s Br. at 14-23) (Dkt. No. 15).

2. The Commissioner erred in applying the "Grid Rule."[2] (Pl.'s Br. at 23-24).

3. The Commissioner should have found plaintiff credible. (Pl.'s Br. at 24-25).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed, dismissing the complaint in its entirety. (Dkt. No. 19). Plaintiff has filed a reply brief. (Dkt. No. 23). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

---

[1] Although the point-heading of plaintiff's brief states that the ALJ failed to properly determine plaintiff's RFC (the Step 4 determination), this section of the brief contains separate arguments with respect to almost every step of the disability analysis. Within the RFC section of the brief, plaintiff argues that: (1) the ALJ erred in failing to consider sleep apnea, borderline intellectual functioning, and possible mental retardation as severe impairments (Step 2); (2) the ALJ failed to develop the record regarding Mental Retardation and determine whether it met the severity of a listed impairment; (3) the ALJ failed to properly evaluate the medical opinions, including those of the treating physicians; and (4) the ALJ failed to adequately consider the combined effect of plaintiff's obesity with her other impairments. For clarity, I will address plaintiff's arguments in this opinion in the order consistent with the steps of the disability analysis.

[2] Plaintiff's counsel is referring to the Medical-Vocational Guidelines found at Appendix 2 of Part 404, Subpart P of Title 20 of the Code of Federal Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 2. These guidelines are often referred to as the "Grids."

## III. APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional

capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* This standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## IV.   FACTS

Plaintiff's brief contains a lengthy statement of facts that defense counsel has incorporated into his brief, in addition to the statement of facts contained in the ALJ's decision. (Pl.'s Br. at 2-14, Def.'s Br. at 2) (citing T. 18-28) (Dkt. No. 19).  The court will adopt the facts as stated by plaintiff as well as the facts stated by the ALJ in her decision, with any exceptions as noted in the court's discussion of the issues.

## V.   ALJ's DECISION

At Step 2 of the disability analysis, the ALJ found that plaintiff had the following severe impairments: degenerative joint disease of the right knee; obesity; asthma; depressive disorder; and anxiety disorder. (T. 20-21).  At Step 3 of the disability analysis, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments. (T. 21-23).  In doing so, the ALJ considered Listing 1.02A, entitled

"Major Dysfunction of a Joint." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02A. The ALJ noted that although plaintiff had degenerative joint disease in her right knee, her impairment did not result in the inability to ambulate effectively as required by the listing. (T. 21).

With respect to plaintiff's mental impairments, the ALJ considered both Listing 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). (T. 22-23). The ALJ found that there was no evidence to show that the plaintiff experienced any episodes of decompensation or "repeated episodes of decompensation" as would be required to establish that plaintiff had a listed impairment. (T. 22). The ALJ also noted that plaintiff's mental impairments did not meet the other requirements for either listing. Plaintiff did not have at least two "marked" limitations in activities of daily living, social functioning, concentration, persistence, and pace. Nor did plaintiff exhibit one marked limitation in the above functions, together with "repeated" episodes of decompensation "each of extended duration." (*Id.*) With respect to Listing 12.06(C), the ALJ found that there was no indication that plaintiff was unable to function independently outside her home. (T. 22). Finally, the ALJ noted that the limitations identified in 12.04(B) did not constitute an RFC finding, and that the ALJ's RFC would contain a more detailed assessment of plaintiff's limitations. (T. 23).

The ALJ then proceeded to Step 4 and found that the plaintiff had the physical RFC to perform sedentary work, with the additional non-exertional limitation that she avoid concentrated exposure to respiratory irritants due to her asthma. (T. 23). The

6

ALJ found that plaintiff retained the mental ability to understand, carry out, and remember simple instructions and directions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. (*Id.*) However, plaintiff would be limited to performing simple one or two-step tasks which are not complex and which do not require complex decision making or supervising others. (*Id.*)

The ALJ considered all of plaintiff's symptoms and determined that her allegations of significant functional limitations were not consistent with the clinical findings and objective medical evidence in the record. (T. 24). The ALJ cited to a report by plaintiff's treating orthopedic surgeon, Dr. John Sullivan, who stated that plaintiff had only moderate limitations for walking, standing, lifting, carrying, pushing, pulling, bending, and climbing, with no limitations in sitting, seeing, hearing, speaking, and using her hands. (*Id.*) Dr. Sullivan stated that a "sedentary job" for plaintiff was "preferable." (*Id.*) The ALJ also discussed the consultative report by Dr. Kalyani Ganesh, noting that plaintiff had a normal gait, and that she had no limitations for sitting, standing or the use of her upper extremities, but had mild to moderate limitations for walking and climbing and that plaintiff's should avoid known respiratory irritants. (*Id.*)

The ALJ discussed plaintiff's mental impairments, and stated that no examiners have found any evidence of cognitive impairments or significant functional limitations. The ALJ cited to Dr. Noia's consultative report, which stated that notwithstanding some difficulty dealing with stress, the plaintiff could understand and

7

follow simple instruction and directions. She could also perform simple and some complex tasks, both with supervision and independently. She could regularly attend to a routine, maintain a schedule, learn new tasks, make appropriate decisions, and relate to others. (T. 24-25).

The ALJ also cited reports authored by Dr. Bahram Omidian and Dr. Vidya Patil, plaintiff's treating psychiatrists. (T. 25). Dr. Patil did not indicate that plaintiff had any more than moderate limitations in her abilities, and only mild limitations understanding, remembering, and carrying out simple instructions. (T. 25). The ALJ found that plaintiff's claims regarding additional symptoms and limitations were only "partially" credible and noted that "the [plaintiff's] testimony regarding her functional limitations significantly exceeds the objective medical evidence and the clinical findings of record." (*Id.*)

The ALJ found that plaintiff would be unable to perform any of her prior work, but found that the additional non-exertional limitations, including her inability to be exposed to respiratory irritants as well as her mental limitations, would not significantly limit the range of sedentary work that she could perform. (T. 27). The ALJ found that the testimony of a vocational expert was not necessary under the circumstances. The ALJ utilized the Grid for sedentary work as a framework to determine that there were jobs existing in significant numbers in the national economy that plaintiff could perform. (*Id.*) As a result, the ALJ found that plaintiff was not under a disability for purposes of the Social Security Act. (*Id.*)

## VI. Severe Impairment

### A. Legal Standard

The plaintiff bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal

effect on an individual's ability to work.' " *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3). The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken. *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step Two may be harmless because the ALJ has continued with sequential analysis and did not deny the claim based on the second step alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### B. Application

Plaintiff argues that the ALJ improperly omitted plaintiff's sleep apnea, her borderline intellectual functioning, and her "possible" mental retardation from the list of severe impairments. The ALJ specifically mentioned plaintiff's sleep apnea in her discussion of "severe" impairments, along with plaintiff's hernia, high blood pressure,

kidney stones, and acid reflux. (T. 21). The ALJ found that these impairments were "briefly mentioned" in the record, but there was insufficient documentation to conclude that the conditions rose to the level of severe impairments. The ALJ did not mention "borderline intellectual functioning" or "possible mental retardation" in her decision.

The court would first point out that because the ALJ found that plaintiff did have some severe impairments, she continued to consider plaintiff's disability under the third through the fifth steps of the disability analysis. As stated above, even if it had been error to omit sleep apnea from the list of severe impairments, the error would have been harmless.[3]

The court also finds, however, that the ALJ's omission of sleep apnea from the list of severe impairments was not error. The ALJ's finding that the sleep apnea diagnosis was "briefly mentioned" is correct. Plaintiff is claiming disability beginning in May of 2007. In April of 2009, Dr. Daniel Horth, M.D., plaintiff's treating general practitioner, mentions that plaintiff has "possible sleep apnea." (T. 317). In August of 2009, plaintiff underwent a sleep study. (T. 394). On August 18, 2009, Dr. Horth wrote that plaintiff was diagnosed with sleep apnea and was fitted for a Continuous

---

[3] Plaintiff never specifies why the failure to include sleep apnea as a severe impairment was allegedly error. Counsel simply states that "[t]he ALJ's failure to include Ms. Clark's sleep apnea and intellectual deficits as severe impairments, and consider them in formulating RFC, was not harmless error." (Pl.'s Br. at 16). Counsel goes on to discuss the intellectual deficits and why the ALJ should have developed the record, but does not specify the reasons that the ALJ should have concluded that sleep apnea significantly limited plaintiff's basic work activities.

Positive Airway Pressure[4] ("CPAP") machine. (T. 394). Dr. Horth also noted that plaintiff was sleeping well with medications. (*Id.*) The next medical report, dated December 19, 2009 does not even mention sleep apnea in the "assessment" section. (T. 397). On January 26, 2010, plaintiff was complaining about insomnia, but the doctor's notation stated that the insomnia was due to stress, not sleep apnea. (T. 401).

On July 29, 2010, Dr. Noia's consultative report mentions that plaintiff had trouble sleeping and that she woke up three or four times per night, but does not associate any limitations with that finding. (T. 416, 419). On July 29, 2010, Dr. Kalyani Ganesh's consultative report mentions sleep apnea in the section discussing plaintiff's "complaints," but does not include the impairment in her "diagnosis" section. (T. 423, 425).

Plaintiff's orthopedic surgeon mentions sleep apnea in one of his reports as one of plaintiff's diagnoses, and one of the emergency room reports mentions sleep apnea. (T. 437, 247). On September 28, 2010, Dr. Horth states that plaintiff has "quite a few social stressors at home, that she "is currently having trouble sleeping," and that she has "early morning awakening." (T. 530). On February 11, 2011, Psychiatrist, Dr. Vidya A. Patil states that plaintiff was not sleeping well and noted that she used the CPAP machine, but that sometimes the machine kept her up. (T. 515). There are no medical reports that do more than mention the fact that plaintiff was diagnosed with

---

[4] A CPAP machine is used to help a person with obstructive sleep apnea breath more easily. www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea. The CPAP machine increases air pressure in the throat so that the airway does not collapse when the person breathes. There are different forms of the machine, but it is one of the most widely used treatment for the impairment. *Id.*

sleep apnea, and nowhere is there a medical record that imposes *any* limitations based upon this impairment. There is no indication that this impairment would limit plaintiff's ability to perform basic work activities. The ALJ's decision to omit sleep apnea from the list of severe impairments, and his reason for doing so, are supported by substantial evidence.

Plaintiff also argues that the ALJ failed to include plaintiff's borderline intelligence and possible mental retardation as a severe impairment. However, because plaintiff did not claim either borderline intelligence or mental retardation as an impairment, plaintiff is essentially arguing that the Commissioner should have developed the record regarding those alleged impairments. Plaintiff also argues that her mental retardation meets the severity of Listing 12:05. The court will consider those arguments together.

## VII. <u>Developing the Record/Listed Impairment</u>

### A. **Legal Standard**

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is the burden of the plaintiff to establish that his or her medical conditions meet *all* of the specific medical criteria of a particular listed impairment. *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in

severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This obligation to fill gaps in the administrative record exists even when a claimant is represented. *Umansky v. Apfel*, 7 F. App'x. 124, 127 (2d Cir. 2001) (citations omitted). However, the duty to investigate further is not absolute, and depends on the record before the ALJ. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Rivera v. Commissioner of Social Sec.,* 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) (holding that the ALJ may satisfy the duty to develop the record by requesting plaintiff's attorney to obtain additional medical documentation).

An ALJ is only required to obtain additional information when the evidence is inadequate to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1512(e), 404.1527(c). Furthermore, plaintiff has "an obligation and burden of producing evidence related to the relevant time period . . . [and] plaintiff cannot simply identify arguable gaps in the administrative record and claim that these gaps are a per se basis for remand." *Dutcher v. Astrue*, No. 09-CV-1161, 2011 WL 1097860 at *5 (N.D.N.Y. Mar. 7, 2011).

## B.    Application

Listing 12.05 is currently entitled Mental Retardation.[5]  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning, initially manifested prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  The severity in Listing 12.05 is met when the plaintiff meets the criteria listed in 12.05(A), (B), (C), or (D).  Plaintiff claims that the ALJ should have considered Listing 12.05(C).

In order to meet the requirements of this subsection, plaintiff must have a valid verbal, performance, or full-scale IQ of 60-70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.[6]  In addition, the plaintiff must also show deficits in adaptive functioning that arise from her cognitive limitations. *Lawler v. Astrue*, 512 F. App'x 108, 110-12 (2d Cir. 2013) (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012)).

At the hearing in this case, plaintiff's counsel mentioned Listing 12.05. (T. 53-54).  The ALJ told plaintiff's attorney that if plaintiff was placed in special education classes when she was in high school, IQ testing would have been done at that time. (T.53-54).  However, the ALJ also noted that such records would be old, and new testing would not be done unless requested by the agency. (T. 54)  After the hearing, plaintiff's counsel submitted some of plaintiff's school records, together with a post-

---

[5] The term "mental retardation" is being phased out of use by the Social Security Administration and has been replaced by the term – "intellectual disability" to represent the same concept. Talavera, 697 F.3d at 148 n.2.  This court will use the terms interchangeably.

[6] This court does not question that plaintiff has other impairments that are severe.

hearing memorandum. (T. 185-88, 189, 207-211, 212-13, 516-24). Plaintiff's counsel also submitted a letter-brief to the Appeals Council. (T. 214-19).

There were various tests administered to plaintiff in school. (*Id*.) Plaintiff argued to the Appeals Council, and argues now, that the ALJ should have developed the record and ordered new IQ testing because her school records indicated IQ scores ranging from 68 at age 12 to 73 at age 15. (T. 215). Counsel also noted that the school psychologist advocated for plaintiff to be labeled mildly mentally retarded. (*Id.*) Counsel also notes that Listing 12.05(C) requires only a valid verbal, performance, or full scale IQ of 60 to 70, together with another mental or physical impairment imposing an additional and significant work-related limitation of function. Plaintiff argues that her additional impairments would qualify under the listing. This court does not agree.

In the hearing decision, the ALJ did not specifically mention Listing 12.05(C), but she did mention that plaintiff's counsel pointed out plaintiff's history of special education and low IQ scores as well as significant physical impairments. (T. 23). Plaintiff argued that because she had behavioral problems, her adaptive behavior was poor. However, the ALJ determined that the examining and treating sources of record found "no evidence of cognitive impairments or significant functional limitations" from her mental impairments. (T. 24).

A review of the school records submitted by plaintiff's counsel shows that in 1982, plaintiff's verbal IQ was 72, her performance score was 85, and her full scale was 77. (T. 516). In 1983, her verbal score dropped to 68, her performance score rose

to 87, and her full scale was 76. (*Id.*)  In 1986, her verbal score was 71, her performance score was 81, and her full scale score was "75 ± 3 points."  The notation on the report stated that plaintiff's verbal and full scale IQ scores were in the "borderline" range, while her performance score was in the "low average" range. (T. 517).

The court notes that only ***one*** of plaintiff's IQ scores was actually in the range required by the listing, and it was from 1983.  Three years later, in 1986, the verbal score was back up to 71, her performance score was 81, and here full scale score was 75.  Plaintiff's counsel argues that plaintiff was labeled mentally retarded, however, the report states that plaintiff was showing subtest scores ranging from "mild mental retardation in her general knowledge and remote memory, to the "average range" in her attention to detail." (T. 518).  The school psychologist felt that plaintiff should be "labeled" mentally retarded, even though her test results would not necessarily qualify, so that she could continue to receive special education services. (*Id.*)

One of the reports specifically states that plaintiff is "learning disabled," she had age appropriate verbal expression with significant delays, could express her ideas on paper, but did not use correct grammar, and had "low average" intellectual functioning. (T. 187).  At the time of the report, plaintiff's classroom behavior did not seriously interfere with instruction, and she needed only "minimal assistance" from support personnel. (*Id.*)  In April of 1987, plaintiff's behavior in school became a problem. (T. 208-209).  Her case was "closed" in 1989. (T. 207).

Defendant has cited *Talavera v. Astrue*, 697 F.3d 145 (2d Cir. 2012) and *Lowry*

*v. Astrue*, 474 F. App'x 801 (2d Cir. 2012), arguing that notwithstanding the ALJ's failure to specifically mention Listing 12:05 in this case, the ALJ's rationale is apparent from her analysis. Plaintiff argues that *Lowry* is distinguishable because the ALJ in *Lowry* actually mentioned and analyzed the listing in question. (Pl.'s Reply Br. at 2). Plaintiff argues that the Commissioner is attempting to defend a legal omission by noting that the ALJ did not believe plaintiff had deficits in "adaptive functioning," while never mentioning "adaptive functioning" in her decision. (Pl.'s Reply Br. at 2).

The facts in *Talavera* are quite similar to this case. In *Talavera*, plaintiff also argued that the ALJ should have found plaintiff disabled at Step 3, in light of her low IQ scores. *Talavera*, 697 F.3d at 152. Talavera also had other physical impairments that needed to be considered in conjunction with her intellectual impairment. *Id.* at 150. In *Talavera*, the plaintiff's low IQ scores were obtained when the plaintiff was an adult, and the court held that there was a presumption that those scores were present prior to the age of 22, as required by the Listing. *Id.* at 152. In this case, plaintiff's one low score was when she was under 22, but plaintiff was 35 years old on the alleged disability onset date. As the ALJ noted, the "examining and treating sources throughout the record have found no evidence of cognitive impairments or significant functional limitations" from her "mental impairments."

While the ALJ did not mention Listing 12.05(C) by its number, she noted that plaintiff had a "history" of special education and low IQ "as well as significant physical impairments . . . ." (T. 23-24). Thus, the ALJ clearly considered the evidence submitted by plaintiff after the hearing. In her decision, the ALJ discussed the

physical impairments first. (T. 24). The ALJ then turned to a discussion of the mental

impairments. Contrary to plaintiff's argument, the court in this case may glean the

ALJ's rationale from her analysis. Plaintiff argues that the ALJ never mentions

"deficits of adaptive functioning." The Diagnostic and Statistical Manual of Mental

Disorders states that it is impairments in adaptive functioning, rather than a low IQ

that are usually presenting symptoms in individuals with mental retardation.

AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL

DISORDERS 42 (4th Ed. Text Revision 2000) (DSM-IV-TR). Adaptive functioning

refers to

> how effectively individuals cope with common life demands
> and how well they meet the standards of personal
> independence expected of someone in their particular age
> group, sociocultural background, and community setting.
> Adaptive functioning may be influenced by various factors,
> including education, motivation, personality characteristics,
> social and vocational opportunities, and the mental disorders
> and general medical conditions that may coexist with Mental
> Retardation.

*Id.* Even though the ALJ did not mention the term "adaptive functioning," the ALJ

stated that the record showed "no evidence of cognitive impairments or significant

functional limitations." (T. 24). The ALJ cited Dr. Noia's report of July 2010,

concluding that, although plaintiff had some difficulty dealing with stress, she was

still able to understand and follow simple instructions and directions. (T. 24). She

could perform simple and some complex tasks, with supervision and independently,

maintain attention and concentration for tasks, regularly attend to a routine, maintain a

19

schedule, learn new tasks, make appropriate decisions, and relate to and interact moderately well with others. (T. 24-25). Plaintiff's treating psychiatrist, Dr. Vidya Patil noted that plaintiff only had a mild limitation in understanding, remembering, and carrying out simple instructions. She had moderate limitations in maintaining attention and concentration and attention, staying on task without supervision, working in close proximity to others without being distracted, and performing at a consistent pace. She would have moderate limitations in her ability to adapt to pressures and changes in a routine work setting. (T. 25).

The ALJ did specifically analyze two other listed mental impairments, and many of the "adaptive functions" are also found in the other listings. (T. 22). In determining that plaintiff did not meet Listings 12.04 and 12.06, the ALJ found that plaintiff had only mild restrictions in activities of daily living, she could dress, bathe and groom herself, cook and prepare food, do some shopping, and reportedly do some laundry. (*Id.*) Plaintiff had only mild restrictions in social functioning, and always interacted appropriately with medical personnel during examinations.

The consultative and treating physicians who examined plaintiff when she was an adult did not indicate that plaintiff was suffering from listing-level mental retardation. Dr. Noia's consultative report stated that plaintiff's manner of relating, social skills, and presentation were "moderately adequate," and her expressive and receptive language was "moderately adequate." (T. 416-17). Plaintiff's thought processes were coherent and goal-directed, and her attention and concentration were intact. (T. 417). Dr. Noia did state that plaintiff's "intellectual functioning [was]

estimated to be in the borderline range," and her general fund of information appeared to be "somewhat limited." (*Id.*) Her insight and judgment were both fair. (*Id.*) Although Dr. Noia stated in his diagnosis that borderline intellectual functioning should be "ruled out," "borderline" functioning, particularly when her adaptive skills were not seriously affected, does not rise to the level of severity required for Listing 12.05(C).

This finding is supported by the Second Circuit's opinion in *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013). In *Tankisi* the court held that the ALJ was not required to obtain a current intelligence test when the basis for Tankisi's argument was a statement by a consultative examiner that the plaintiff had "borderline to deficient" intellect or that plaintiff was "somewhat limited intellectually." (*Id.*) Plaintiff in this case attempts to distinguish *Tankisi* by arguing that this plaintiff actually submitted evidence of "sub average" performance on previous IQ testing, and Dr. Noia identified borderline intellectual functioning as a "possible" impairment. (Pl.'s Reply Br. at 6). However, the IQ testing submitted by this plaintiff indicates that only one of the older IQ scores was of Listing level,[7] and the accompanying

---

[7] *Compare* (T. 516) (examination in 1983 – one score below 70) *with* (T. 517) (examination in 1986 – all scores above 70). In her summary the school psychologist states that it was "suggested that Laurie be labeled mentally retarded and continue placement in an Option I classroom for children with special needs." (T. 518). In a report, dated March 11, 1987, a speech therapist wrote that plaintiff demonstrated weakness in formulating grammatical sentences (compound/complex) in oral and written mode and vocabulary understanding. (T. 522). The therapist noted that due to the plaintiff's pregnancy and subsequent giving birth, her attendance was "erratic" at the beginning of the year. Should she continue school, it was recommended that she receive language therapy. Plaintiff was almost 17 years old at the time. It is true that plaintiff did not finish high school, but according to this record, it is unclear what the actual reason was that she left school.

reports specifically stated that plaintiff was being labeled mentally retarded in order to allow her to continue obtaining special education.

The ALJ in this case found that plaintiff had some "moderate" difficulties, but ultimately found that she retained the ability to understand, carry out, and remember simple instructions and directions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. (T. 25). She is limited to performing simple one two-step tasks which are not complex and which do not require complex decision-making. (T. 25). Thus, although the ALJ may not have used the phrase "adaptive skills," her analysis completely covered the skills that would be considered "adaptive," and her failure to cite Listing 12.05(C) was harmless.

The ALJ's failure to develop the record further with respect to plaintiff's alleged IQ scores was not error. In *Lawler*, the ALJ determined that the plaintiff's IQ scores were "invalid." The court found that it did not need to determine whether substantial evidence supported the ALJ's determination regarding the validity of the scores because substantial evidence supported the ALJ's finding that plaintiff did not demonstrate the required limitations in adaptive functioning, even though "the ALJ did not base her conclusion about listing 12.05 on Lawler's adaptive functioning . . . ." 512 F.3d at 111.

In *Lawler*, the court held that the ALJ was not required to obtain a new IQ score because in determining plaintiff's RFC, the ALJ noted several different medical opinions about the plaintiff's ability to remember, follow instructions, perform simple

tasks, and engage in unskilled work. *Id.* In fact, the regulations recognize that individuals with IQ scores in the 60s or even lower may still be able to work full-time if their adaptive functioning is still intact. *Talavera*, 697 F.3d at 153 (citing *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007)). *See also Roach v. Colvin*, No. 5:12-CV-992, 2013 WL 5464748, at *7 (N.D.N.Y. Sept. 30, 2013) (the medical evidence of record was sufficient for the ALJ to make a proper RFC determination, despite the fact that plaintiff's intellectual functioning was in the borderline to low average range, and ALJ took plaintiff's cognitive limitations into account when formulating the RFC) (citing *Tankisi, supra*).

In her reply brief, plaintiff cites *Ali v. Astrue*, No. 09-CV-2123, 2010 WL 889550 at *5 (E.D.N.Y. March 8, 2010) for the proposition that the language of the regulations does not require a "complete" lack of adaptive functioning. (Pl.'s Reply Br. at 5). While this statement is true, there is substantial evidence in this record that plaintiff's adaptive functioning is at most "moderately" and sometimes only "mildly" affected. Finally, as stated above, only one of plaintiff's scores put her in the level of Listing 12.05(C), and it was not the most recent set of scores. Thus, the Commissioner's failure in this case to follow up on plaintiff's IQ scores or specifically analyze Listing 12.05(C) was not error.

## VIII. RFC Evaluation/Treating Physician

### A. Legal Standards

#### 1. RFC Evaluation

In rendering a residual functional capacity (RFC) determination, the ALJ must

consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).

RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute her own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)), (Report-Recommendation), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, at *3 (N.D.N.Y. Aug. 2, 2005)). In addition

to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ must properly analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32-33.

### B. Application

Plaintiff argues that the ALJ failed to give proper weight to plaintiff's treating general practitioner, Dr. Horth and failed to properly analyze the other medical evidence in determining plaintiff's RFC. Dr. Horth completed an RFC evaluation, finding that plaintiff could lift up to 20 pounds occasionally, but could only sit, stand, or walk for one hour each in an eight hour workday. (T. 502, 503). The ALJ gave this report limited weight because it was inconsistent with the longitudinal medical evidence and the doctor's own treatment notes. (T. 26). As the ALJ pointed out, Dr. Horth assigned limitations with the use of plaintiff's hands for reaching, and there is

nothing in his treatment notes that refers to such limitations or any impairment that might be associated with the limitations. The court notes that in his RFC evaluation, Dr. Horth states that plaintiff has "multiple muscle aches and pains associated w/depression," and that these limit plaintiff's full activities. (T. 504). Dr. Horth's treatment notes do not make mention of these "multiple muscle aches and pains," and there is no indication of how these aches and pains limit plaintiff's activities. Plaintiff argues that the ALJ should have re-contacted Dr. Horth to clarify this issue.

In furtherance of the duty to develop the record as stated above, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R.§§ 404.1512(e), 416.912(e). "Gaps in the administrative record warrant remand for further development of the record." *Toribio v. Astrue*, 06-CV-6532, 2009 U.S. Dist. LEXIS 66500, 2009 WL 2366766, at *8 (E.D.N.Y. July 31, 2009) (citing, inter alia, *Echevarria v. Secretary of Health & Hum. Servs.*, 685 F.2d 751, 755–56 (2d Cir. 1982).

In this case, the ALJ was not obligated to recontact Dr. Horth because there was sufficient evidence in the record for the ALJ to make her decision. The ALJ gave more weight to the report of Dr. Sullivan,[8] plaintiff's orthopedic surgeon, who found on April 15, 2009, that plaintiff's only "physical" impairment was the degenerative

---

[8] Dr. Sullivan would also be considered a treating physician. Although plaintiff argues that she did not see Dr. Sullivan as many times as defendant's brief asserts, plaintiff did have several examinations by Dr. Sullivan, and he did perform her surgery. The ALJ's reliance on Dr. Sullivan's assessment is supported by substantial evidence, given that he is an orthopedic surgeon, commenting on an orthopedic impairment, and happens to be plaintiff's treating surgeon.

joint disease in her right knee, and opined that plaintiff only had moderate limitations

for walking, standing, lifting, carrying, pushing, pulling, bending, and climbing.[9] (T.

434). Dr. Sullivan found that plaintiff had no limitations for sitting, seeing, hearing,

speaking, and using her hands. (*Id.*) He concluded that a "sedentary job" would be

preferable for plaintiff with "limited walking and lifting." (T. 435).

Although plaintiff's counsel argues that there is no definition of "moderate" in

the form used by Dr. Sullivan, the court notes that Dr. Sullivan did state that there

were "no" limitations on sitting. Plaintiff also argues that Dr. Sullivan's statement

that plaintiff's only physical impairment was her knee impairment was due to the fact

that plaintiff's knee impairment was the only impairment he was treating. While that

may be true, no physician other that Dr. Horth mentioned any upper extremity

restrictions. Dr. Sullivan clearly believed that the plaintiff was capable of sedentary

work. The term "no" limitation is clear, and the ALJ found that plaintiff could

physically perform sedentary work, prior to considering the non-exertional limitations.

Dr. Sullivan's report was more consistent with the RFC submitted by

consultative physician Dr. Ganesh. Although Dr. Ganesh found that plaintiff could

lift and carry up to 100 pounds (T. 427), the ALJ did not rely upon that portion of Dr.

Ganesh's report. Instead, the ALJ cited only Dr. Ganesh's narrative report, finding

that plaintiff had "no" limitations for sitting, standing, or the use of her upper

---

[9] Dr. Sullivan signed an earlier, similar RFC evaluation on February 27, 2009. (T. 220-21). Although the ALJ commented that in the February, 2009 report, Dr. Sullivan noted that plaintiff had no mental limitations, the ALJ did not rely upon that report to determine plaintiff's mental limitations. (T. 24). As plaintiff's counsel points out, Dr. Sullivan is an orthopedic surgeon and his expertise would normally be limited to evaluating plaintiff's knee impairment.

extremities. (T. 24). In his narrative report, he concluded that plaintiff had mild to moderate limitations for walking and climbing, and that plaintiff should avoid respiratory irritants. (T. 425). Dr. Ganesh never mentioned lifting in his narrative report.

Dr. Ganesh never mentioned any problems with plaintiff's upper body, even though his report indicates that he examined plaintiff's "upper extremities." (T. 423-25). He noted in his report that plaintiff's hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally. (T. 424). She had full range of motion in her shoulders, elbows, forearms, wrists, and fingers bilaterally. There was no joint inflammation, effusion or instability in her upper extremities, and her strength was 5/5 in her proximal and distal muscles. (*Id.*) There was no atrophy and no sensory abnormality, but her reflexes were absent. (*Id.*) Her thoracic and lumbar spine was normal, and the strength in her lower extremities was 5/5. (T. 425).

Dr. Ganesh also mentioned that plaintiff's gait was normal, but that she could not walk on her heels and toes and could not squat. (T. 424). Her station was normal, she used no assistive devices, and she needed no help changing her clothes or getting on and off of the examination table. (*Id.*) The flexibility in her lower extremities was limited by her "adipose tissue," not because of any pain or joint limitations. (*Id.*) Thus, Dr. Ganesh also considered plaintiff's obesity in his determination of her physical abilities, and Dr. Ganesh's report is consistent with Dr. Sullivan's statement

that plaintiff's knee impairment was her only physical problem.[10]

The ALJ's rejection of Dr. Horth's restrictive RFC is supported by substantial evidence, and there was no obligation for the ALJ to recontact Dr. Horth prior to making her decision. The court will consider the effects of plaintiff's mental impairments on her RFC below in considering whether the ALJ should have used the Grid.

## IX. Credibility

### A. Legal Standard

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also*

---

[10] Plaintiff argues that the ALJ did not properly take plaintiff's obesity into account when determining plaintiff's RFC. In *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011), the court found that the "ALJ implicitly factored Drake's obesity into his RFC determination by relying on medical reports that repeatedly noted Drake's obesity and provided an overall assessment of her work-related limitations." The ALJ in this case specifically found plaintiff's obesity to be a severe impairment, and every physician examining plaintiff noted her obesity in every report. As stated above, Dr. Ganesh specifically stated that plaintiff's knee flexion was limited by "adipose" tissue. Clearly, that is a reference to plaintiff's obesity, and involves her range of motion and physical abilities. Thus, plaintiff's obesity was similarly factored into the ALJ determination of plaintiff's RFC.

*Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### B.    Application

Plaintiff argues that the ALJ erred in finding that plaintiff was not credible. The ALJ found that plaintiff was "partially credible" because the "claimant's testimony

30

regarding her functional limitations significantly exceed[ed] the objective medical evidence and the clinical findings in the record." (T. 25). In rejecting plaintiff's restrictive assessment of her own abilities, the ALJ noted that plaintiff lived with her four children and fiancé. She was able to take public transportation, care for a young child, and engage in activities of daily living. (T. 24). Plaintiff's counsel argues that the ALJ exaggerated plaintiff's abilities, and although she did have a young child, she lived with three older children who "assist her." (Pl.'s Br. at 19) (citing T. 52, 53).

The medical records do not support plaintiff's assertions. On April 14, 2008, Dr. Horth stated that although plaintiff did have pain in both knees, she stayed "fairly active" with the kids at home. (T. 323). A review of Dr. Horth's reports also indicates that plaintiff's adult children were anything but "helpful." (T. 397). On December 15, 2009, Dr. Horth stated that "[plaintiff] has several adult children living with her who are causing a lot of discord in the home." (*Id.*) (*See also* T. 401). Dr. Horth also stated that "she has a 4 ½ -year-old who possibly has ADHD who is misbehaving and abusive toward her screaming all the time. (T. 397). Plaintiff was attempting to get her son into a special school at that time. Thus, the ALJ's finding that plaintiff was taking care of a young active child, is supported by substantial evidence. On December 22, 2009, Dr. Horth stated that plaintiff was having problems with the older children, including the 17 year-old's smoking issues and disobedience. Thus, plaintiff's testimony that her adult children were assisting her in taking care of her younger child is contradicted by her statements to Dr. Horth.

On the same day, Dr. Horth stated that he encouraged plaintiff to exercise for 30

minutes and to walk for 30 minutes at least three times per week. (T. 399). Although the next sentence is unclear, it appears that plaintiff told Dr. Horth that she was going to try to "do it 5 times weekly." On September 10, 2010, Dr. Horth noted that plaintiff did not suffer any daytime drowsiness from her medications. (T. 530). Dr. Ganesh's report indicates that plaintiff's strength and physical abilities were greater that she asserted. Dr. Ganesh stated that, in addition to caring for her five-year-old child, plaintiff "can cook and clean daily" and care for herself daily.[11] (T. 424). Thus, the ALJ's finding that plaintiff exaggerated her symptoms is supported by substantial evidence.

## X.  Non-Exertional Impairments/The Grid

### A.  Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines. *Id.*

"If a claimant has nonexertional limitations that 'significantly limit the range of

---

[11] In *Drake v. Astrue,* the Second Circuit also upheld the district court's conclusion that the ALJ's credibility determination was supported by evidence that "plaintiff had the ability to cook and care for herself, operate a car, complete household chores, care for her son, and run errands. It was also supported by medical evidence suggesting tat Drake's impairments did not limit her ability to perform light work." 443 F.3d at 657. Although plaintiff in this case did not drive a car, she was able to take public transportation in addition to completing household chores, and caring for her small child.

work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert nor preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Guidelines and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

**B.      Application**

Plaintiff argues that the ALJ erred in relying on the Grid to find that plaintiff was not disabled. She argues that her nonexertional impairments were sufficiently limiting to require the ALJ to call a vocational expert to testify regarding the availability of work in the national economy for an individual with the plaintiff's limitations. The ALJ in this case found that although plaintiff had nonexertional impairments, this impairments "have little or no effect on the occupational base of unskilled sedentary work." (T. 27). The ALJ found that plaintiff's need to avoid environmental irritants could have some impact upon the available jobs, but would not preclude all work activity at this level "when considering the availability of sedentary occupations." (*Id.*)

Next the ALJ found that although plaintiff had some mental impairments, which are also nonexertional, the Social Security Rulings provide that as long as an individual can perform the "basic mental demands of competitive, remunerative, unskilled work, the individual may be found to be 'not disabled.'" (*Id.*) (citing Social Security Ruling ("SSR") 85-15). Because plaintiff had no "significant limitations" in her ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting, the occupational base of sedentary work was maintained, and sufficient jobs existed that plaintiff could perform.

There is no dispute that plaintiff has both exertional and non-exertional limitations; the issue is whether plaintiff's non-exertional impairments significantly limit the range of sedentary work that she is able to perform. The ALJ gave great weight to Dr. Noia's report, indicating that plaintiff appeared to be able to maintain attention and concentration for tasks, regularly attend to a routine, maintain a schedule, learn new tasks, and make appropriate decisions. (T. 418). Dr. Noia stated that plaintiff appeared to be able to relate to and interact "moderately well" with others, but had some difficulty dealing with stress. (*Id.*) The RFC form that Dr. Noia completed notes that plaintiff had mild limitations in several categories, and had "mild to moderate" limitations in her ability to interact appropriately with supervisors and co-workers." (T. 421). In the form signed by Dr. Noia, "moderate" limitations are defined as "more than a slight limitation . . . but the individual is still able to function satisfactorily." (T. 420).

The court does note that in the form signed by Dr. Patil, the term "moderate" is defined differently than in Dr. Noia's report. In Dr. Patil's form, moderate is defined as "significantly limited, but not precluded from performing the activity." (T. 510). Dr. Patil checks "moderate" for various of plaintiff's limitations, such as her ability to maintain attention, her ability to stay on task, her ability to work in close proximity to others, her ability to perform at a consistent pace, her ability to interact appropriately with the public, and her ability to adapt to pressures and changes in a routine work setting. (T. 510-11). Dr. Noia's form is clearly marked as a Social Security form, while Dr. Patil's form has no identifying characteristics.

While the two doctors differed in their opinions of plaintiff's restrictions, "[i]t is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in the medical evidence are for the Commissioner to resolve). The ALJ clearly stated in her decision that she gave great weight to the Administration's consultative examiners,[12] in part, because of their programmatic expertise.[13] (T. 25). The ALJ stated that she gave "some weight"

---

[12] The ALJ cited both Exhibit 9F (Dr. Noia) and 10F (Dr. Ganesh).

[13] See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (ALJs must consider the findings of state agency medical consultants and other program physicians because they are highly qualified and are also experts in Social Security disability evaluations); Diaz v. Shalala, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (the opinions of non-examining sources may override treating sources' opinion provided if they are supported by evidence in the record).

to the other examining and treating sources.[14] (T. 25-26). Dr. Omidian found that plaintiff's intellectual abilities were between sub-average and average and that her general fund of knowledge and intellect seemed to be "comfortable with her schooling," and that her expressed insight and judgment "seemed to be fair." (T. 508). Finally, on February 11, 2011, Dr. Omidian commented that plaintiff's affect was appropriate although her mood was "withdrawn," and that she reported that she still felt depressed and overwhelmed with the stress of taking care of her children. (T. 515). Plaintiff told Dr. Omidian how "busy" some of her children kept her because they "have some disability of ADHD," and that she had a teenage daughter who was giving her a hard time so that she had to deal with that frustration.[15] (*Id.*)

Plaintiff argues that the ALJ should have also considered plaintiff's borderline intelligence and "possible" mental retardation as further limiting factors. Because this court finds that the ALJ's consideration of these impairments was appropriate, the

---

[14] The ALJ cited Exhibits 11F (Dr. Sullivan - physical ), 16F (Dr. Omidian), and 17F (Dr. Patil). Dr. Omidian did not complete a mental RFC form.

[15] Plaintiff's counsel correctly points out that the ALJ erred in stating that plaintiff's GAF score of 60, as scored by Dr. Omidian meant that plaintiff had "some mild to moderate symptoms." (Pl.'s Br. at 22) (citing T. 25). The DSM-IV-Tr states that a GAF score of 60 correlates with "moderate" symptoms. DSM-IV-Tr at 34. Any error in this regard would have been harmless. The question at step 5 is whether the plaintiff's nonexertional impairments would significantly narrow the range of exertional work that plaintiff could perform, not whether the impairment itself is severe and would significantly limit basic work activities. *See Zabala v. Astrue*, 595 F.3d 402, 407, 410-11 (2d Cir. 2010) (plaintiff had severe mental impairment, but ALJ did not err in using the Grid when he found that petitioner's mental condition did not limit her ability to perform "unskilled" work – plaintiff's mental ability did not limit her ability to carry out simple instructions, deal with work changes, and respond to supervision, when she had "no more than moderate limitations in her work-related functioning"); *Winbush v. Comm'r of Soc. Sec.*, No. 7:12-CV-427, 2013 WL 4678377, at *5 (N.D.N.Y. Aug. 30, 2013) (concluding that ALJ correctly determined that plaintiff's severe mental impairments did not prevent plaintiff from meeting the basic mental demands of unskilled work and finding that a vocational expert was not required).

ALJ would not have erred in failing to consider them as further restricting plaintiff's ability to perform sedentary work.

The ALJ used the Grid as a framework. She found that plaintiff's non-exertional impairments would not significantly diminish the sedentary work available to plaintiff and thus, found her not to be disabled within the meaning of the Social Security regulations. The ALJ's analysis is supported by substantial evidence in the record.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: November 18, 2013

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**